per curiam:
La presente controversia, cuya certificación nos solicitó el Tribunal de Distrito Federal para el Distrito de Puerto Rico, nos permite resolver si es válido en nuestra jurisdicción un acuerdo de arbitraje vinculante entre un doctor y su paciente previo a una operación quirúrgica. De-bemos evaluar si, en el marco de la relación médico-paciente, las partes pueden acordar de antemano renun-ciar al foro judicial y optar por el arbitraje para dirimir reclamaciones de impericia médica.
Expedimos la certificación que solicita el foro federal y resolvemos que un acuerdo de arbitraje de esta índole no es válido en Puerto Rico porque no satisface las exigencias de la Ley de Arbitraje Comercial, Ley Núm. 376 de 8 de mayo de 1951 (32 L.P.R.A. see. 3201 et seq.), por atentar contra el orden público que sirve de freno a la libertad contractual y porque propone resolver un reclamo de impericia médica por la vía contractual cuando estos casos se atienden de acuerdo con el derecho de responsabilidad extra-contractual. Asimismo, la decisión de invalidar el pacto también se fundamenta en nuestra reiterada norma de que los tribunales son los foros que dispone la ley para dirimir los casos de impericia médica y, como tales, no pueden ser relegados a favor de otras alternativas. Veamos.
I
La Sra. María de los Ángeles Martínez Marrero, el Sr. Carlos Rubén Rosa y la sociedad de gananciales compuesta por ambos demandaron al Dr. Efraín González Droz, un ginecólogo-obstetra que efectuaba procedimientos de ciru-gía plástica y que, a causa de ello, perdió su licencia para practicar la medicina en Puerto Rico.
En la demanda, presentada ante el Tribunal de Distrito Federal para el Distrito de Puerto Rico por diversidad de *583 ciudadanía,(1) la señora Martínez Marrero alegó que el doctor González Droz le realizó una cirugía de aumento de busto y una abdominoplastia de manera negligente. Según ésta, ello provocó que su cuerpo quedara mutilado y con varias cicatrices permanentes. La demanda por impericia médica se basó en el Art. 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 5141, que dispone que todo aquel que por acción u omisión cause daño a otro, mediante su culpa o negligencia, tendrá la obligación de reparar el perjuicio causado.
La señora Martínez Marrero alegó, además, que tuvo que recurrir al Dr. Carlos M. Portocarrero por unas moles-tias que sentía en el área operada por el doctor González Droz. Tras una evaluación, se le extrajo un tejido interno pútrido que le habían dejado en la primera intervención. El doctor Portocarrero también arregló la asimetría en el busto de la demandante, que había sido resultado de la cirugía anterior. En esta segunda intervención, se descu-brió que la demandante no tenía indicios de haberse reali-zado una abdominoplastia, pues las suturas no correspon-dían con las incisiones que deben hacerse en este tipo de procedimiento.
Oportunamente, el doctor González Droz presentó una moción para que se desestimara la demanda. Adujo que, como parte de los documentos relacionados con la doctrina de consentimiento informado, su paciente había firmado un pacto de arbitraje vinculante. El acuerdo firmado por el doctor González Droz y la señora Martínez Marrero dis-pone de la forma siguiente:
En la eventualidad de que ocurra un resultado adverso que a mi juicio yo entienda que surgió como consecuencia de esta cirugía y decida reclamar responsabilidad al Dr. Efraín Gon-zález Droz, por los hechos, me comprometo y acepto libre y *584 voluntariamente a que la controversia o reclamación sea deci-dida por un Panel de Arbitraje, y no por una Corte Judicial Estatal ó [sic] Federal.
Este Panel se regirá conforme a las leyes de arbitraje de Puerto Rico, y estará constituido por cinco miembros médicos y abogados seleccionados por las partes envueltas en la controversia. Estos miembros han de tener como requisito am-plio conocimiento y experiencia en la materia, además de estar activos en su práctica profesional. Apéndice de la Petición de Certificación Interjurisdiccional.
En conformidad con lo anterior, y según señala el doctor González Droz, la señora Martínez Marrero renunció a presentar ante el foro estatal o federal cualquier reclama-ción futura que surgiera como consecuencia de la cirugía a la que se habría de someter. En cambio, tales controversias futuras se adjudicarían por un panel de cinco árbitros que en su momento la señora Martínez Marrero seleccionaría junto al doctor González Droz. El panel tendría que estar compuesto tanto por médicos como por abogados expertos en la materia y activos en la práctica.
La señora Martínez Marrero se opuso a la desestima-ción de la demanda solicitada por el doctor González Droz por entender que su consentimiento al pacto estuvo viciado y que su firma había sido falsificada. Además, adujo que en Puerto Rico no está permitido someter controversias sobre impericia médica a un proceso de arbitraje vinculante. A su entender, ello sería contrario al orden público.
Tras realizarse un descubrimiento de prueba, el foro federal resolvió la controversia sobre la legitimidad de las firmas y concluyó que eran genuinas. No obstante, debido a sus dudas sobre la validez de este tipo de pacto y ante las ramificaciones del caso para la práctica médica en la Isla, el 24 de abril de 2009 nos solicitó que certificáramos las preguntas siguientes: (1) ¿Es válido en Puerto Rico un acuerdo de arbitraje vinculante entre un doctor y su pa-ciente? (2) De asumir que un acuerdo de tal naturaleza es válido, ¿qué límites, si alguno, tendría?
 Según hemos indicado anteriormente, “[e]n térmi- *585 nos generales, el procedimiento de certificación inteijuris-diccional es el instrumento procesal adecuado que permite a un tribunal someter preguntas, para una contestación definitiva, a otro tribunal de jurisdicción distinta, sobre cuestiones dudosas que se refieren al Derecho de esa jurisdicción”. Guzmán v. Calderón, 164 D.P.R. 220, 227 (2005). De igual forma, “[l]as contestaciones a esas pregun-tas obligan en cualquier procedimiento judicial ulterior en-tre ambas jurisdicciones, bajo la doctrina de cosa juzgada ...”. Id. Además, mediante la certificación interjurisdiccio-nal se preserva y respeta, verdaderamente, “la función prístina de las cortes estatales de interpretar y formular el derecho de [sus respectivos] estados”, contribuyendo a que se alivien en buena parte las tensiones inherentes al sis-tema federalista. Pan Ame. Comp. Corp. v. Data Gen. Corp., 112 D.P.R. 780, 785 (1982). Dicho procedimiento ha dado lugar “a una útil colaboración entre las dos jurisdicciones[, la federal y la estatal]”. Medina & Medina v. Country Pride Foods, 122 D.P.R. 172, 181 (1988). Así, se ha reconocido la primacía de las normas de derecho civil en la resolución de conflictos de derecho privado. Id.
Para determinar si acogemos un recurso de certificación expedido por el Tribunal de Distrito Federal para el Distrito de Puerto Rico, corresponde evaluar los requerimientos de una certificación inteijurisdiccional. La Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003 (Ley de la Judicatura de 2003), Ley Núm. 201 de 22 de agosto de 2003 (4 L.P.R.A. sec. 24 et seq.), dispone en su Art. 3.002(f) que este Tribunal podrá atender cualquier asunto que le certifique el Tribunal Supremo de Estados Unidos, un tribunal apelativo federal, un tribunal de distrito federal o las cortes revisoras de máxima jerarquía en los estados. 4 L.P.R.A. sec. 24s(f). La certificación inteijurisdiccional surge cuando alguno de los tribunales anteriormente citados enfrenta una controversia judicial en la que están involucradas “cuestiones de derecho puertorri- *586 queño que pueden determinar el resultado del mismo y respecto al cual, en la opinión del tribunal solicitante, no existan precedentes claros en la jurisprudencia de este Tribunal”. íd.
Tras evaluar los hechos del caso, decidimos expedir la certificación que nos solicitó el foro federal porque los asuntos planteados versan sobre cuestiones de derecho puertorriqueño que no son atendidos de forma particular por jurisprudencia previa de este Tribunal. Asimismo, de-cidimos expedir porque entendemos que, al atender estas controversias, se determinará el resultado del caso ante el foro federal. Luego de expedir la certificación solicitada y tras analizar todos los planteamientos, estamos en posi-ción de resolver y procedemos a así hacerlo.
II
A. Como cuestión inicial corresponde examinar si la Ley de Arbitraje Comercial, que regula de forma especial los pactos de este género en Puerto Rico, permite el tipo de cláusula contractual en controversia. El alcance de dicho estatuto está expresamente establecido en su Artículo 1, que dispone:
Dos o más partes podrán convenir por escrito en someter a arbitraje ... cualquier controversia que pudiera ser objeto de una acción existente entre ellos a la fecha del convenio de so-meter a arbitraje; o podrán incluir en un convenio por escrito una disposición para el arreglo mediante arbitraje de cual-quier controversia que en el futuro surgiere entre ellos de dicho acuerdo o en relación con el mismo. Tal convenio será válido, exigible e irrevocable salvo por los fundamentos que existieran en derecho para la revocación de cualquier convenio. (Enfasis suplido.) 32 L.P.R.A. see. 3201.
Para sostener la validez de un pacto de arbitraje, no es suficiente que dos partes la hayan acordado libremente. Se requiere, además del pacto válido, que se satisfagan las exigencias dispuestas en la Ley de Arbitraje *587 Comercial. El referido estatuto sólo permite el arbitraje en dos supuestos: (1) cuando ya hay una controversia existente (una herencia pendiente o un accidente automovilístico que ya sucedió, por ejemplo), y (2) cuando se quieren atender controversias futuras que surjan del propio acuerdo o estén relacionadas con éste. Esta segunda modalidad es una cláu-sula accesoria a un contrato principal que es muy común en el contexto comercial. Véanse: PaineWebber, Inc. v. Soc. de Gananciales, 151 D.P.R. 307 (2000); Rivera v. Samaritano & Co., Inc., 108 D.P.R. 604 (1979); McGregor-Doniger v. Tribunal Superior, 98 D.P.R. 864 (1970).
En el caso ante nos, el pacto de arbitraje entre médico y paciente se suscribió previo a la operación quirúrgica y sin que estuviese trabada controversia alguna.(2) Así, no se sa-tisfizo la primera modalidad de la Ley de Arbitraje Comer-cial que requiere que el pacto se haga una vez establecida una controversia. Distinto hubiese sido el caso si, una vez consumado el daño por la negligencia médica, tanto el mé-dico como la paciente —ya trabada la controversia— deci-dieran someterse voluntariamente al arbitraje. En ese su-puesto, que no está presente en el caso de autos, se cumplirían los preceptos de la primera modalidad de la *588 Ley de Arbitraje Comercial y el arbitraje sería válido para resolver la controversia.
Tampoco se satisfacen las exigencias de la segunda mo-dalidad de la Ley de Arbitraje Comercial, pues el arbitraje acordado no se fundamentó en discrepancias futuras que pudieran surgir del mismo pacto. El acuerdo firmado por el doctor González Droz y la señora Martínez Marrero nada disponía sobre desavenencias producto del mismo pacto. Guardaba total silencio sobre ese aspecto. Versaba, en cambio, sobre la pretendida renuncia de la señora Martí-nez Marrero a remedios judiciales en casos de impericia médica producto de la intervención quirúrgica. La segunda modalidad de la Ley de Arbitraje Comercial es, en reali-dad, una cláusula accesoria a un contrato principal que es muy común en el contexto comercial pero que no está pre-sente en este acuerdo. El pacto de arbitraje entre las par-tes, pues, no cumplió con ninguna de las dos modalidades que provee la Ley de Arbitraje Comercial.
Nada de lo aquí dicho resta fortaleza a la vigorosa polí-tica pública que existe en Puerto Rico a favor del arbitraje como método de resolución de conflictos. U.C.P.R. v. Triangle Engineering Corp., 136 D.P.R. 133 (1994). No obstante, en ausencia de legislación que regule el arbitraje pactado por las partes en casos de impericia médica, es indudable que la cláusula en este caso no está cobijada por la Ley de Arbitraje Comercial. Examinemos, sin embargo, si la misma es válida según el palio del Código Civil.
B. Un examen de la normativa vigente nos convence de que el pacto de arbitraje tampoco satisface los requisitos de un contrato válido en Puerto Rico debido a que viola el orden público. El Art. 1207 del Código Civil de Puerto Rico, 31 L.P.R.A. see. 3372, dispone que “[l]os contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público”. He-mos dicho antes que la libertad de contratación privada *589 que gobierna nuestro ordenamiento jurídico no es irres-tricta, pues la ley, la moral y el orden público son sus frenos. Luan Invest. Corp. v. Rexach Const. Co., 152 D.P.R. 652 (2000). La doctrina ha intentado definir y darle forma al impreciso e inexacto concepto de orden público, estable-ciendo que es una serie de normas e ideales en la sociedad que no siempre alcanzan una formulación estatutaria y que, más aún, trascienden esa codificación. “El orden pú-blico no se agota en una formulación legal, a lo que se opondría su carácter dinámico.” J.A. Doral, La noción de orden público en el Derecho civil español, Pamplona, Eds. Universidad de Navarra, 1967, pág. 15. “[E]l orden público abarca indeterminadamente el hueco dejado por la ley en lo no preceptuado o prohibido de modo taxativo por ella pero que perjudicaría, de tolerarse, al interés general. Por eso figura como un límite, una excepción: todo lo que no está prohibido por la ley ni es contrario a la moral y al orden público, está permitido.” Id., pág. 18.
Asimismo, cuando se trata de derechos fundamentales, de alta jerarquía en la sociedad y en el bienestar general, el orden público como freno a la libertad contractual cobra aún mayor vigor. “El orden público rebasa su concreción como orden en el Estado; es decir, es algo más que la orga-nización necesaria para el buen funcionamiento del Estado. Esto explica la invocación que hace la doctrina al orden público en los llamados derechos irrenunciables por estar unidos a la personalidad, adscritos al cumplimiento de deberes ... inherentes a los derechos o facultades subs-traídos, por razones superiores, al poder de disposición del individuo .... En tales casos, el orden público no actúa in-defectiblemente de manera defensiva sino a modo de un resorte del bien común, que incluye tanto el bien de la persona como el de la colectividad”. (Escolio omitido.) Doral, op. cit., págs. 40-41.
En el presente caso, sin duda hubo un pacto celebrado entre dos partes contratantes que tienen capacidad *590 para obligarse. No obstante, dicho acuerdo es violatorio del orden público por privarle a la paciente de buscar un re-curso judicial en caso de padecer un daño a raíz de la ne-gligencia médica. La integridad de los pacientes que acu-den a un médico para obtener un servicio que les permita recuperar o mejorar la salud está por encima de la libertad contractual que permea nuestro ordenamiento y del favo-ritismo por el arbitraje como política pública. Los médicos proveen servicios cuyo objeto principal es el cuerpo humano. Como tal, los casos de impericia médica casi siempre buscan reparar un daño sufrido sobre el cuerpo o sobre la salud en general del ser humano. Oliveros v. Abréu, 101 D.P.R. 209 (1973). Nuestra jurisprudencia ha resaltado lo fundamental que resulta el derecho a la invio-labilidad del cuerpo. Santiago Otero v. Méndez, 135 D.P.R. 540 (1994). Ese derecho está protegido, en términos concre-tos, por el consentimiento informado que tiene que expre-sar todo paciente al decidir si se interviene con su cuerpo y de qué manera. Recientemente, este Tribunal reconoció una vez más "el derecho de todo paciente a participar ple-namente de las decisiones relacionadas con su salud y cui-dado médico”. Lozada Tirado et al. v. Testigos Jehová, 177 D.P.R. 893 (2010). Véanse, también: Sepulveda de Arrieta v. Barreto, 137 D.P.R. 735 (1994); Rodríguez Crespo v. Hernández, 121 D.P.R. 639 (1988). Sobre este asunto, el profe-sor Mosset Iturraspe señala:
[E]n la medicina, más allá de la repercusión económica de la muerte, la enfermedad o incapacidad, se hallan en juego bie-nes que se sitúan fuera del comercio, inalienables e impres-criptibles; calificados como derechos de la personalidad; su salvaguarda o protección compromete el orden público social. (Énfasis suplido.) J. Mosset Iturraspe, Responsabilidad civil del médico, Buenos Aires, Ed. Astrea, 1985, pág. 21-22.
En ausencia de legislación que delimite y regule el al-cance de la aplicabilidad del arbitraje pactado por las par- *591 tes en la relación médico-paciente, existe un peligro real —no meramente teórico— de que acuerdos de este tipo, sin parámetro alguno, rijan la relación entre el médico y el paciente en casos de impericia médica. Al certificar el pre-sente recurso, el Tribunal de Distrito Federal nos alertó sobre varios casos del Tribunal de Apelaciones de Puerto Rico en que se han devuelto a los foros de instancia contro-versias sobre vicios del consentimiento en otros “acuerdos de arbitraje” suscritos por el propio doctor González Droz. Surge de esos casos que por lo menos tres pacientes del doctor González Droz cuestionaron la validez de tales acuerdos de arbitraje por vicios del consentimiento, ya que no fueron informadas adecuadamente sobre los efectos del procedimiento arbitral. Véanse: Lugo Lugo v. González Droz, KLAN-2008-00605; Rivera Lugo v. González Droz, KLAN-2007-00730; Terreforte Lugo v. González Droz, Núm. KLAN-2006-001325. Sin duda resulta sumamente preocupante —y atenta contra el orden público— que una persona que practicó la cirugía plástica sin una licencia para ello pueda evadir su responsabilidad por los actos ne-gligentes en que haya incurrido a través de pactos de arbi-traje como el que está en controversia en este caso.
Por lo tanto, estamos plenamente convencidos de que el concepto orden público, como acopio y reflejo de los princi-pios generales del Derecho, recoge el prominente valor ju-rídico de protección a la salud e integridad física de un paciente médico, incluso su derecho al consentimiento in-formado sobre lo que vaya o no a hacerse sobre su cuerpo. La función imprescindible que proveen los médicos en nuestra sociedad, y la confianza depositada por los pacien-tes en ellos, es lo que este Tribunal debe proteger según el palio del concepto orden público. De acuerdo con el ordena-miento actual, no podemos aceptar el argumento de que la paciente consintió a una cláusula que no está permitida por la legislación que regula el arbitraje en Puerto Rico.
*592 III
Ahora bien, independientemente de la existencia de un contrato entre las partes en un caso como éste, por décadas este Tribunal ha resuelto que las acciones de daños por impericia profesional son de índole extracontractual y, por ende, deben ser atendidas al amparo del Art. 1802 del Código Civil, supra. En conformidad con lo anterior, en esta jurisdicción los médicos, abogados y notarios responden por su negligencia profesional según el Art. 1802 del Código Civil, supra. Véanse: Colón Prieto v. Géigel, 115 D.P.R. 232 (1984), y Chévere v. Cátala, 115 D.P.R. 432 (1984).
Sobre este particular, en Ramos v. Orientalist Rattan Furnt., Inc., 130 D.P.R. 712, 727 — 728 (1992), explicamos cómo lidiar con una acción de daños en la que se puede reclamar por la vía contractual o extracontractual. Se trata de la llamada concurrencia de acciones. Resolvimos que
... únicamente procede la acción en daños contractuales ... cuando el daño sufrido exclusivamente surge como consecuen-cia del incumplimiento de una obligación específicamente pac-tada, daño que no ocurriría sin la existencia del contrato. Ahora bien, ... resulta procedente una reclamación de daños extracontractuales como resultado del quebrantamiento de un contrato, si el hecho causante del daño constituye una viola-ción del deber general de no causar daño a otro y, a la vez, incumplimiento contractual. (Énfasis suplido y escolio omitido.) Ramos, supra, pág. 727.
Como los daños sufridos a causa de un acto de impericia profesional no tienen que surgir de una obligación pactada previamente entre las partes, expresamos que tales accio-nes se rigen por el Art. 1802 del Código Civil, supra. Ello independientemente de que esté involucrado un contrato. Ramos v. Orientalist Rattan Furnt., Inc., supra, pág. 728 esc. 10. Véase J. Ataz López, Los médicos y la responsabi-lidad civil, Madrid, Ed. Montecorvo, 1985.
*593 Por otra parte, en el contexto de los pactos en la relación médico-paciente, el Art. 1802, supra, cobra aun mayor fuerza como vehículo procesal porque los documentos fir-mados podrían interpretarse como parte del proceso de consentimiento informado y no como un contrato.
La señora Martínez Marrero firmó los acuerdos de arbi-traje en controversia como parte del proceso previo a la cirugía, llevado a cabo conforme a la doctrina de consenti-miento informado. De hecho, la señora Martínez Marrero ha alegado en este caso que uno de los “acuerdos de arbi-traje” se suscribió durante el día de la operación, cuando estaba bajo el efecto de sedantes. La firma de estos docu-mentos no debe estar enmarcada en el derecho de contra-tos, sino en el deber jurídico de todo profesional médico de no causarle daño a sus pacientes, so pena de incurrir en responsabilidad civil extracontractual.
Al respecto, en Sepulveda de Arrieta v. Barreto, 137 D.P.R. 735 (1994), expresamos que el derecho de todo paciente a la autodeterminación y a decidir libremente qué hacer con su cuerpo está protegido por los tribunales. Por ello, antes de intervenir con el cuerpo de cualquier paciente se requiere obtener su autorización. Ese consentimiento, sin embargo, tiene que ser informado o ilustrado. Es decir, se le impone al médico la obligación de ofrecerle a su paciente todos aquellos datos que sean necesarios para que éste comprenda la naturaleza del tratamiento, sus riesgos y complicaciones, y los beneficios que se esperan de éste. Véase, además, Ríos Ruiz v. Mark, 119 D.P.R. 816 (1987).
La doctrina del consentimiento informado no es, pues, de origen contractual. De hecho, diversos tratadistas han rechazado que este principio se reduzca a la mera firma de formularios, como ocurrió en este caso. Se ha denominado tal visión como incorrecta, engañosa y hasta peligrosa. Véase, e.g., F.A. Rozovsky, Consent to Treatment, 2da ed., Boston, Little, Brown and Co., 1990, pág. 3.
*594 En el presente caso, la señora Martínez Marrero firmó una serie de documentos previos a la operación que no fue-ron en realidad producto de una negociación contractual sino, más bien, parte del proceso de consentimiento infor-mado que, como norma general, debe prestar todo paciente a su médico antes de ser intervenido. Entre esos documen-tos firmados figura el llamado pacto de arbitraje. En otras palabras, al igual que sucede con la responsabilidad civil del médico, la doctrina del consentimiento informado tiene su origen en principios extracontractuales. Esto es, simple-mente, función del deber jurídico que emana de la relación médico-paciente, ya sea que ésta se base en un contrato o no. En consecuencia, el consentimiento prestado por Martí-nez Marrero al pacto de arbitraje en controversia podría estar viciado, pues no fue propiamente el producto de una negociación contractual.
Por último, este Tribunal ha refrendado la intervención original de la Rama Judicial en asuntos de impericia médica. En Vélez Ruiz v. E.L.A., 111 D.P.R. 752 (1981), invalidamos los paneles de arbitraje compulsorios estable-cidos en el Código de Seguros, y que formarían parte del Tribunal de Primera Instancia, porque éstos intervenían con funciones judiciales esenciales. Allí defendimos la in-tervención judicial original en pleitos de impericia médica como un asunto de entronque constitucional. (3)
Así las cosas, desde 1986 se estableció un proceso particularizado para atender casos de impericia médica. En particular, el Art. 41.080 del Código de Seguros de Puerto Rico, 26 L.P.R.A. see. 4108, exige que toda acción civil que surja de una reclamación de daños por impericia médico-hospitalaria se iniciará mediante la presentación *595 de una demanda en el tribunal competente. Es a partir de ello que el juez, en el ejercicio de su discreción, puede asig-nar el caso a un panel de arbitraje que tendrá las funciones de un Comisionado Especial. Es evidente que la Legisla-tura ha diseñado un proceso específico para atender las acciones de daños por impericia médica. En este proceso establecido legislativamente, el arbitraje permanece como opción, pero única y exclusivamente luego de presentada la demanda ante el tribunal, y siempre y cuando el juez la solicite.
IV
Para concluir, contestamos las preguntas que nos pre-senta el foro federal de la forma siguiente: un pacto de arbitraje como el que nos ocupa es inválido en esta juris-dicción porque (1) no satisface ninguna de las modalidades discutidas de la Ley de Arbitraje Comercial; (2) atenta contra el orden público; (3) nuestra jurisprudencia interpreta-tiva sobre impericia médica ha resuelto consecuentemente que los daños producto de la negligencia médica se atende-rán según el Art. 1802 del Código Civil, supra, indepen-dientemente de si medió un contrato o no en la relación médico-paciente, y (4) conforme al ordenamiento dispuesto por la Asamblea Legislativa, las controversias de impericia médica en Puerto Rico se inician a través de la presenta-ción de una demanda en los tribunales y solamente a par-tir de ese momento, a discreción del juez, puede entonces convocarse al arbitraje.
Por haber contestado categóricamente la primera inte-rrogante planteada por el foro federal, es innecesario en-trar a considerar la segunda cuestión sobre la extensión de la validez de este tipo de pactos. Contestada la pregunta del Tribunal de Distrito Federal para el Distrito de Puerto Rico, se devuelve el caso a dicho foro.

Se dictará sentencia de conformidad.

*596 El Juez Asociado Señor Martínez Torres concurrió con una opinión escrita, a la cual se unió el Juez Asociado Se-ñor Rivera García. La Juez Asociada Señora Rodríguez Ro-dríguez disintió sin opinión escrita.
Opinión concurrente emitida por el Juez Asociado Señor Martínez Torres, a la cual se une el Juez Asociado Señor Rivera García.
Estoy de acuerdo con la conclusión a la que llega el Tribunal en este caso. Sin embargo, me veo precisado a emitir una opinión concurrente porque estoy convencido de que se puede llegar al mismo resultado por medio de un análisis integrado de la legislación vigente y una aplicación dis-tinta de la misma. Hay expresiones del Tribunal que con-sidero que no hacen falta para resolver este caso y que pueden crear confusión en áreas del Derecho que estaban claras hasta ahora.
A pesar de que la Ley de Arbitraje de Puerto Rico, Ley Núm. 376 de 8 de mayo de 1951 (32 L.P.R.A. 3201 y ss.), estableció un lenguaje amplio a favor del arbitraje, la en-mienda al Código de Seguros aprobada mediante la Ley Núm. 6 de 30 de diciembre de 1986 (26 L.P.R.A. see. 4108), creó una excepción específica para los casos de impericia médica.
I
La señora María de los Ángeles Martínez Marrero acu-dió al doctor Efraín González Droz para que le realizara una cirugía de aumento de busto y una abdominoplastía. Inconforme con el resultado, que se alega mutiló el cuerpo de la paciente Martínez Marrero, el señor Carlos Rubén Rosa y la sociedad legal de bienes gananciales que ambos *597 componen demandaron al ginecólogo-obstetra, quien per-dió su licencia para ejercer la medicina en Puerto Rico por practicar cirugías plásticas sin autorización para ello.
La demanda se presentó ante el Tribunal de Estados Unidos para el Distrito de Puerto Rico, que acogió el caso por diversidad de ciudadanía, toda vez que el doctor Gon-zález Droz actualmente reside en California. Le imputaron negligencia de acuerdo con el Art. 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. see. 5141.
El galeno solicitó la desestimación de la demanda por-que la señora Martínez Marrero firmó un acuerdo de arbi-traje antes de operarse. En el documento renunciaba a la posibilidad de presentar una demanda por daños ante el tribunal estatal o federal. Así, aceptó que un panel de cinco árbitros dilucidara cualquier reclamación posterior relacio-nada a resultados adversos que pudiera tener la cirugía.
A pesar de la alegación de la demandante de que se falsificó su firma en el acuerdo, el tribunal federal concluyó que ésta era genuina. Sin embargo, el tribunal federal nos solicita mediante recurso de certificación interjurisdiccio-nal que resolvamos: (1) si es válido en Puerto Rico un acuerdo de arbitraje vinculante entre doctor y paciente, y (2) si el acuerdo es válido, cuáles son sus límites. Luego de analizar la solicitud del tribunal federal, decidimos expedir la certificación solicitada.
II
La Ley de Arbitraje Comercial hace viable que dos o más partes acuerden por escrito llevar a arbitraje “cual-quier controversia que pudiera ser objeto de una acción existente entre ellos a la fecha del convenio de someter a arbitraje; o podrán incluir en un convenio por escrito una disposición para el arreglo mediante arbitraje de cualquier controversia que en el futuro surgiere entre ellos de dicho acuerdo o en [sic] relación al mismo”. 32 L.P.R.A. see. 3201.
*598 El profesor David M. Helfeld señala que aunque la Ley de Arbitraje Comercial se deriva de la Ley de Arbitraje Federal, 9 U.S.C. sec. 1 y ss., la primera tiene un lenguaje más amplio que la segunda. D.M. Helfeld, La jurispruden-cia creadora: factor determinante en el desarrollo del dere-cho de arbitraje en Puerto Rico, 70 Rev. Jur. U.RR. 1, 54, 123 (2001).
Por un lado, la Ley de Arbitraje Federal limita su campo de acción a transacciones marítimas y comerciales. Define comercio como las transacciones entre estados o territorios de Estados Unidos, o entre éstos y países extranjeros. Ex-cluye los contratos de empleo de marinos, trabajadores de ferrocarriles y otros empleados involucrados en el comercio interestatal. 9 U.S.C. sec. 1.
Por otro lado, la Ley de Arbitraje Comercial se puede hacer extensiva mediante acuerdo entre las partes a cual-quier controversia existente o a cualquier controversia que pudiera surgir en el futuro. “Por lo tanto, disputas legales en las áreas como daños y peijuicios, herencia y derecho de familia, entre otras no estrictamente de naturaleza contractual o comercial, están sujetas a la Ley Núm. 376.” Helfeld, supra, pág. 54.
Este lenguaje amplio de la Ley de Arbitraje Comercial puede limitarse por legislación. En Walborg Corp. v. Tribunal Superior, 104 D.P.R. 184 (1975), sostuvimos la validez del Artículo 3-b de la Ley sobre Contratos de Distribución de Puerto Rico, Ley Núm. 75 de 24 de junio de 1964 (10 L.P.R.A. sec. 278b-2), a pesar de que declara nula toda estipulación que promueva el arbitraje. Sin embargo, revo-camos ese dictamen quince años después, en World Films, Inc. v. Paramount Pict. Corp., 125 D.P.R. 352 (1990). En este último caso declaramos inconstitucional el referido ar-tículo de la Ley sobre Contratos de Distribución en Puerto Rico en la medida en que contradice la Ley de Arbitraje Federal. Así, actuamos conforme la jurisprudencia estado- *599 múdense que reconocía que la Ley de Arbitraje Federal ocupó el campo, y que los acuerdos de arbitraje sobre tran-sacciones marítimas y comerciales cobijadas de acuerdo con el estatuto estadounidense prevalecen sobre las leyes locales que establezcan una política pública contraria.
Por otro lado, hemos sostenido leyes que excluyen el ar-bitraje como remedio en materias que quedan fuera del alcance de la Ley de Arbitraje Federal. Vélez v. Serv. Legales de P.R., Inc., 144 D.P.R. 673 (1998). También hemos derogado leyes que imponen el arbitraje en contravención con nuestra Constitución. Vélez Ruiz v. E.L.A., 111 D.P.R. 752 (1981).
Precisamente, en Vélez Ruiz v. E.L.A., supra, declara-mos inconstitucional el esquema de arbitraje obligatorio que estableció la Ley Núm. 74 de 30 de mayo de 1976 para casos de impericia médica. Llegamos a esa conclusión por-que se usurpaban las funciones que la Constitución le con-fiere a la Rama Judicial por hacer mandatorio el arbitraje y obligatorio el laudo. Eso removía el caso de los tribunales por siempre.
A raíz de nuestra decisión, la Asamblea Legislativa aprobó la Ley Núm. 6 de 30 de diciembre de 1986 (26 L.P.R.A. see. 4108). Esta enmienda al Código de Seguros dispone:

See. 4108. Reclamaciones-Demanda

Toda acción civil que surja de una reclamación de daños por culpa o negligencia por impericia profesional médico-hospita-laria (malpractice) se iniciará mediante la radicación de una demanda en la sala del tribunal competente. En estas acciones civiles, el tribunal tendrá discreción para someter la reclama-ción a arbitraje....
Con el beneficio de este marco jurídico, pasemos a con-testar las interrogantes del Tribunal Federal para el Dis-trito de Puerto Rico.
*600 III
“Puerto Rico tiene pleno poder para auspiciar y regla-mentar el arbitraje en áreas no cubiertas por la F.A.A. [Ley de Arbitraje Federal], tales [como] disputas que involucran daños y perjuicios, relaciones de la familia, y la herencia. Las palabras textuales de la Ley Núm. 376, no restringen su cobertura a las disputas comerciales, pero el entendi-miento general ha sido a tal efecto.” Helfeld, supra, pág. 123.
Coincidimos con la interpretación del profesor Helfeld. El Art. 1 de la Ley de Arbitraje Comercial, 32 L.P.R.A. see. 3201, por sí solo, es lo suficientemente amplio como para abarcar el caso de marras, pero el Código de Seguros im-pide su aplicación a casos de impericia médica.
La Ley de Arbitraje Comercial se extiende a dos situaciones. La primera se trata de cuando las partes acuerdan ir a arbitraje por una controversia ya existente. La segunda, cuando en un convenio se incluye el arbitraje como mecanismo para atender “cualquier controversia que en el futuro surgiere entre ellos” relacionada a ese acuerdo.
La segunda situación abarca el caso de una persona que contrata a otra para recibir un bien o servicio, y pacta un procedimiento de arbitraje como contrato accesorio al principal para resolver controversias que pudieran surgir en el futuro. Si no fuera por la excepción del Código de Seguros, ése podría ser el caso de un paciente que contrata a un médico para que le intervenga quirúrgicamente y de ante-mano acuerdan un procedimiento de arbitraje para aten-der reclamaciones que pudieran surgir por impericia. En este caso, el legislador estableció una excepción al arbitraje como cuestión de política pública a través de la enmienda al Código de Seguros de 1986. Esta excepción requiere que toda reclamación de daños por culpa o negligencia por im-pericia médica se inicie con la presentación de una de- *601 manda civil en el tribunal competente y, de ahí, el tribunal tiene discreción para activar un panel de árbitros.
El lenguaje que utilizó la Asamblea Legislativa en ese artículo es más amplio que el del caso que lo inspiró. En Vélez Ruiz v. E.L.A., supra, declaramos inconstitucional un esquema de arbitraje que removía los casos presentados en el tribunal para llevarlos a un panel de árbitros. El es-quema era mandatorio y el laudo del panel de árbitros era final y obligatorio. El caso nunca regresaba al tribunal. Así, se usurpaban los poderes de la Rama Judicial, en vio-lación del Art. V de la Constitución de Puerto Rico, L.P.R.A., Tomo 1.
La enmienda al Código de Seguros que se aprobó en 1986 como consecuencia de nuestra decisión en Vélez Ruiz v. E.L.A., supra, determinó que toda reclamación por impe-ricia médica tiene que comenzar con una demanda ante los tribunales. Aunque el lenguaje es más amplio que nuestra disposición en Vélez Ruiz entendemos que su texto cae den-tro de las prerrogativas de la Asamblea Legislativa, toda vez que no invade el campo que ocupó la Ley de Arbitraje Federal.
Otro asunto es si un paciente realmente está en posición de consentir al arbitraje como parte del proceso de contra-tación de un médico. El Tribunal señala que esto violenta el derecho del paciente “al consentimiento informado sobre lo que vaya o no a hacerse sobre su cuerpo”. Sin embargo, el acuerdo de arbitraje es accesorio, para resolver contro-versias legales entre el médico y la paciente, y no tiene que ver con el consentimiento y el entendimiento de la paciente con respecto al alcance de la operación, sus riesgos y consecuencias. Es a eso a lo que se refiere la doctrina de consentimiento informado. Esta “impone al médico el deber de informar a su paciente acerca de la naturaleza y riesgos de un tratamiento médico propuesto, de manera que el pa-ciente se encuentre en la posición de hacer una decisión inteligente e informada”. Rodríguez Crespo v. Hernández, *602 121 D.P.R. 639, 664 (1988). Véanse, además: Lozada Tirado et al. v. Testigos Jehová, 177 D.P.R. 893 (2010); Sepulveda de Arrieta v. Barreto, 137 D.P.R. 735 (1994).
El Tribunal señala también que el acuerdo de arbitraje entre la señora Martínez Marrero y el doctor González Droz atenta contra el orden público “porque propone resolver un reclamo de impericia médica por la vía contractual cuando estos casos se atienden a la luz del derecho de res-ponsabilidad extracontractual”.
Es harto conocida la diferencia entre las acciones con-tractuales y las extracontractuales. Entre estas últimas se encuentran las reclamaciones de indemnización por los da-ños y peijuicios sufridos, por culpa o negligencia. Véanse: Ramos v. Orientalist Rattan Furnt., Inc., 130 D.P.R. 712 (1992); E.L.A. v. Soto Santiago, 131 D.P.R. 304 (1992). Sin embargo, eso no impide que los casos de daños extracon-tractuales concluyan mediante transacción. E.g., Sagardía de Jesús v. Hosp. Aux. Mutuo, 177 D.P.R. 484 (2009). “Este contrato —descrito por Scaevola como un ‘instrumento de paz alcanzada’— es consensual, recíproco y oneroso. En éste, las partes, mediante sacrificios mutuos, finiquitan una controversia con el propósito de evitar los pesares que conllevaría un litigio.” US Fire Insurance v. A.E.E., 174 D.P.R. 846, 853 (2008). Por su naturaleza, la transacción está sujeta a las normas de interpretación de contratos. Orsini García v. Srio. de Hacienda, 177 D.P.R. 596 (2009); López Tristani v. Maldonado, 168 D.P.R. 838 (2006). Sin embargo, la manifestación del Tribunal en el caso de autos pone en duda la legitimidad de las transacciones en los casos de daños extracontractuales, pues estos acuerdos también buscan resolver por la vía contractual una recla-mación por responsabilidad extracontractual.
De todos modos, entiendo que es innecesario entrar en estas cuestiones en este momento porque el análisis inte-grado de las leyes aplicables resuelve la controversia de *603 este caso y excluye el arbitraje como alternativa para los casos de impericia médica.
De esta forma, contestamos en la negativa a la primera pregunta que certificó el Tribunal Federal para el Distrito de Puerto Rico. No es válido en Puerto Rico un acuerdo de arbitraje entre un médico y un paciente para atender re-clamaciones futuras por impericia médica. La contestación a la primera interrogante hace innecesario responder a la segunda, pues como la ley actual prohíbe contratar una cláusula de arbitraje compulsorio en casos de impericia médica, no tenemos que definir los límites de semejante acuerdo.
IV
En conclusión, la amplitud del lenguaje de la Ley de Arbitraje Comercial podría cobijar una situación como la de este caso si no fuera por la enmienda que se hizo al Código de Seguros en 1986. El Art. 41.080 del Código, supra, tuvo el efecto de establecer como política pública que toda reclamación civil por impericia médica comienza con una demanda civil en los tribunales. Por no tratarse de un área cobijada por la Ley de Arbitraje Federal, la Asamblea Legislativa puede establecer válidamente una excepción al arbitraje en estos casos.
Ya que este análisis resuelve la controversia, concurro respetuosamente con la Opinión del Tribunal.

 El doctor González Droz es residente de California, mientras que la señora Martínez Marrero reside en Puerto Rico.

 La Procuradora del Paciente promulgó el Reglamento Núm. 7617 de 21 de noviembre de 2008, cuyo propósito es administrar la Carta de Derechos y Responsa-bilidades del Paciente. En dicho reglamento se prohíbe específicamente que
“... un proveedor solicite a un paciente o haga formar parte del consentimiento informado a ser firmado por el paciente lo siguiente:
(1) Aspectos sobre cualquier decisión relacionada con la posibilidad de algún acto de negligencia de un proveedor, en cuyo caso dicha decisión puede ser errónea ante un momento de vulnerabilidad del paciente, dada la condición de salud del paciente y la dependencia con la institución o proveedor en dicho momento en particular.” Art. 13, Sec. 8(c)(1), del Reglamento Núm. 7617, supra.
Aunque de primera intención podría aparentar que este reglamento dispone de la controversia, no lo es. Los hechos del presente caso sucedieron en el 2006, mien-tras que el reglamento entró en vigor en el 2008. Por lo tanto, el reglamento aludido no gobierna el caso ante nos, por no tener carácter retroactivo. Ahora bien, como correctamente señala el Primer Circuito de Apelaciones del foro federal al analizar una versión previa del reglamento en Rivera v. Centro Medico de Turabo, Inc., 575 F.3d 10,_(1er Cir 2009), “el reglamento es evidencia persuasiva de la política pública que existe en Puerto Rico en la actualidad” a favor de prohibir que se incluya en los documentos de consentimiento informado asuntos relacionados con la posible negligencia del proveedor médico. (Traducción nuestra.)

 Pocos años antes de nuestra decisión en Vélez Ruiz v. E.L.A., 111 D.P.R. 752 (1981), el Tribunal Supremo de Illinois tomó el mismo curso de acción al declarar inconstitucional la ley que creaba un arbitraje compulsorio mediante un panel a base de que ello constituía un ejercicio indebido de la función judicial por personas extra-ñas a la Judicatura. Wright v. Central Du Page Hospital Association, 347 N.E.2d 736 (1976).